**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| HAROLD GUIDO | Case No. 20-45516-169 |
| Debtor. | Hon. Bonnie L. Clair |
| DANIEL L. CASAMATTA,<br>Acting United States Trustee, | |
| Movant | Hearing Date: June 29, 2021<br>Hearing Time: 10:00 a.m.<br>Location: 111 South 10th Street |
| v. | Courtroom 7 South<br>St. Louis, Missouri 63102 |
| WILLIAM H. RIDINGS, JR., | |
| Respondent. | |

**RESPONSE AND OBJECTION OF DEBTOR'S COUNSEL TO MOTION OF THE
UNITED STATES TRUSTEE FOR EXAMINATION OF THE FEES OF DEBTOR'S
ATTORNEY PURSUANT TO LOCAL RULE 2093(C)(3), 11 U.S.C. § 329, AND
FEDERAL RULE OF BANKRUPTCY PROCEDURE 2017**

Counsel to the debtor in the above-captioned chapter 7 case, William H. Ridings, Jr.

("Ridings" or "Counsel"), by and through undersigned counsel,[1] submits the following response

and objection to the "United States Trustee's Motion for Examination of Debtor's Attorney's Fees

and Fee Agreements with Debtor Pursuant to Local Rule 2093, 11 U.S.C. § 329(b), and Federal

Rule of Bankruptcy Procedure 2017," filed in the above-captioned case (the "UST Motion").

Counsel accordingly presents the Court with this response and objection to the UST Motion.

---

[1] Admitted *pro hac vice* in related cases; admission *pro hac vice* in this case pending.

## I.  INTRODUCTION

This is the latest in a series of (now) five, almost identical motions filed by the UST challenging Counsel's use of a bifurcated engagement structure to offer his client the option of making installment payments of counsel's post-petition fees, and his relationship with Fresh Start Funding ("FSF"), a company that provides him with a working capital line of credit and payment management services to facilitate Counsel's provision of installment payment terms to his client.[2] As with the related motions, the UST Motion in this case asserts the following arguments:

> (a) that the pre-filing and the post-filing agreements unbundle the services Ridings is to provide to the Debtor and thus violate Local Rule 2093(c)(3); and

> (b) that it is *per se* unreasonable for Ridings to charge his pay-over-time clients $200 more than his traditional, prepaid clients.

Neither of these arguments are persuasive and the Motion should be denied in its entirety.

## II.  FACTS

### A.  General Response to Facts Asserted by the UST

In general, Counsel concurs in the UST's explication of the organic facts related to this matter.  To the extent, however, that issues raised by the UST may require the Court to adjudicate facts, Counsel should be given the opportunity to adduce testimony—potentially from Counsel and the Debtor.  In particular, any question of informed consent by the Debtor, or reasonability of Counsel's fees, should require an evidentiary hearing.

### B.  Additional Facts

1.      Counsel's business relationship with FSF is memorialized in a "Line of Credit and Accounts Receivable Management Agreement" and a related "Line of Credit Note." FSF is a

---

[2] Counsel is informed by the UST that at least two more motions of the same type can be expected shortly, which will bring the total to seven.

financing and payment management company that works with consumer attorneys across the United States to help them offer payment terms to their clients. FSF's attorney clients include practitioners in family law, criminal defense, immigration, and a host of other consumer-law specialties, including consumer bankruptcy. In the world of consumer bankruptcy, FSF also provides attorneys with best-practice forms and know-how to bifurcate chapter 7 engagements in order to offer their chapter 7 clients post-petition payment terms.[3] FSF's program for consumer bankruptcy attorneys consists of an integrated suite of services: asset-based, working-capital financing; payment management services; credit reporting for clients making payments; know-how, forms and best-practices education; and a defense guaranty and indemnity in the event that the attorneys' bifurcation practice or relationship with FSF are called into question. With the FSF program in place, both Ovation and Shultz began offering a bifurcated engagement option to clients who could not afford to pay up-front fees.

2.    The financing component of FSF's relationship is a recourse line of credit, secured by a collateral assignment of receivables as security for repayment.[4] FSF provides Counsel with a revolving line of credit that may be drawn against each time post-petition payment terms are extended to a chapter 7 client, so long as certain basic underwriting requirements are met. This

---

[3] In the many other non-bankruptcy practice areas in which FSF is involved, the idea of "bifurcation" is completely unnecessary, and it is wholly non-controversial that attorneys offer their clients payment terms for their fees.

[4] FSF takes a collateral interest in the receivables to secure the attorney's repayment of the debt, but does not "factor" or buy the receivable.  The attorney maintains ownership of the receivable, although it is pledged as collateral security for the repayment of the debt.  The attorney remains liable to FSF for the balance owed, including FSF's fee, whether or not the client pays. FSF manages the receivable as the attorney's agent, and reports payments to the credit bureaus, thereby providing an attractive opportunity to the debtor to begin rehabilitating their credit immediately after filing their chapter 7 case.

financing assists Counsel with cash flow challenges that naturally arise by offering clients payment terms.

3.      Counsel is allowed to draw on the line of credit 75% of the amount of the post-petition fee associated with each submitted post-petition engagement. Of that amount, 65% is advanced immediately. Ten percent is credited to a "holdback account," which operates as a pooled risk fund for client payment delinquencies and defaults, thereby mitigating the risk that Counsel will be asked to come out of pocket to repay advances that have been made against accounts that are not fully paid by clients. FSF's fee for the financing, payment management services, credit reporting, education and support, and defense guaranty and indemnity, is calculated as 25% of the value of the post-petition fee in each engagement for which Counsel elects to take a draw against the line of credit. Counsel is responsible to pay this fee (as well as to repay advances) regardless of whether clients pay their attorney fees.

4.      Counsel was provided with basic forms that FSF has vetted against the case law summarized below, and that FSF's outside ethics counsel has approved. These forms include the following:

•       a template Pre-Filing Agreement;

•       a template Post-Filing Agreement; and,

•       a template Form B2030 Attorney Disclosure of Compensation.

5.      Once Counsel enters into a bifurcated engagement with a chapter 7 client, the Post-Filing Agreement, proof of the client's income, and proof of the bankruptcy filing are uploaded to FSF through an online portal. Following a simple underwriting process, Counsel receives the requested advance, and credit to the holdback account. Pursuant to the Finance Agreement, Counsel appoints FSF as its agent for managing the payments from each client, which FSF collects

electronically either through debit card or ACH transactions. Payments from the clients are applied to Counsel's indebtedness. Counsel's clients receive positive credit references by making their payments, providing an attractive opportunity for the clients to begin rehabilitating their credit immediately after filing bankruptcy. Counsel's financing and payment management relationship with FSF are disclosed clearly to clients in both the Pre-Filing and Post-Filing Agreements. Payments made by the clients are for earned fees and are not advance payment for future services.

6.       FSF contractually disclaims any right to influence Counsel's representation of the client or to receive attorney-client confidential information beyond the limited sharing of information minimally necessary to underwrite Counsel's advance, to take a lien against receivables, and to manage the client's payments, all of which is done with the client's consent.

7.       Using the Form B2030 template provided by FSF, Counsel robustly discloses to this Court in each bifurcated case 1) the fact that the engagement is bifurcated and a description of the separate agreements, 2) that Counsel has charged a higher fee for a bifurcated engagement, 3) that Counsel financed the case through FSF and the basic terms of that relationship.

### III. LEGAL ANALYSIS

A. <u>Bifurcation Is a Legitimate Practice Designed to Provide Representation to People Who Couldn't Otherwise Afford to Retain Counsel to Assist with Bankruptcy</u>.

Debtors are languishing outside of bankruptcy longer than ever before and at great personal and societal costs. In a recently published article, the co-investigators of the Consumer Bankruptcy Project summarized these conclusions after a comprehensive review of the bankruptcy system. <u>See</u> "Life in the Sweatbox," Pamela Foohey, Robert M. Lawless, Katherine Porter & Deborah Thorne, 94 *Notre Dame L. Rev.* 219 (2018) (hereinafter, "*Sweatbox*"). Among their conclusions:

- debtors wait longer than ever to file, despite crushing financial pressure, <u>id.</u> at 235;

- debtors and, in particular, "long strugglers" who languish two years or more in financial distress before filing, arrive in bankruptcy with less assets and higher debts, id. at 239-41;

- debtors (and, again, particularly "long strugglers") go without "medicine, food, utilities, car repairs, and paying the mortgage or rent" before filing, id. at 242-43;

- this "[f]inancial misery hurts families," id. at 255;

- "existing in a state of money scarcity damages people's ability to lead productive lives," id. at 257; and,

- entering bankruptcy with higher debts and fewer assets hampers people's ability to truly obtain a fresh start, regardless of the discharge, id. at 259-60.

Once debtors make the difficult choice to file bankruptcy, the assistance of counsel becomes critical to their success. *Pro se* debtors have a far lower chance of achieving a discharge than those who have attorneys. Virtually all represented debtors obtain a discharge, but *pro se* debtors have a several times higher likelihood of failing to achieve this fresh start. See *Sweatbox* at 229 n. 55; see also Angela K. Littwin, "The Affordability Paradox: How Consumer Bankruptcy's Greatest Weakness May Account for Its Surprising Success," 52 W. & Mary L. Rev. 1933, 1974 tbl. 3b (2011) (summarizing study results that represented chapter 7 debtors were nine times more likely to get a discharge than unrepresented debtors). Moreover:

> [t]he burden that *pro se* debtors place on the court system has been widely recognized. Judges, trustees, and court staff have detailed the extra time and system resources eaten up by aiding *pro se* debtors who are attempting to navigate the complexities of the bankruptcy process. Moreover, these efforts and resource expenditure are often for naught. The chance a *pro se* debtor's case will be dismissed because of a failure to comply with the dictates of the Bankruptcy Code and Rules is considerably higher than if the debtor were [*sic*] represented.

Lois R. Lupica & Nancy Rapoport, "Best Practices for Limited Services Representation in Consumer Bankruptcy Cases," Final Report of the ABI National Ethics Task Force at 50 (Amer. Bankr. Inst. April 21, 2013).

What, then, are the options for debtors who cannot afford to fully pay an attorney in advance to represent them in a chapter 7 case? In the recently released Final Report of the American Bankruptcy Institute's three-year Commission on Consumer Bankruptcy, [5] four alternatives are discussed to the most preferable (but currently unavailable) option of having chapter 7 attorney's fees declared non-dischargeable by Congress: 1) "The attorney can delay filing a chapter 7 case until the debtor has paid up front all of the anticipated fees in the case," id. at 90; 2) "The attorney can file a chapter 7 case without receiving full payment of the anticipated fees, hoping that the debtor will voluntarily pay the fees from non-estate assets postpetition," id. at 91; 3) "The attorney can bifurcate the legal services to be provided, first entering into an agreement with a nominal fee covering only prepetition services and then entering into a postpetition agreement for the bulk of the fees to cover postpetition services" as to which, "[b]ecause it occurs postfiling and creates postfiling obligations, the automatic stay and the bankruptcy discharge do not apply," id.; or 4) "The debtor can file the case under chapter 13 instead of chapter 7," id.  Each of these options is perfectly legal but, among them, bifurcation best balances a debtor's needs for immediate relief and the assistance of counsel, and the attorney's need to be paid.

So-called "layaway plans" are not a good solution. Delaying bankruptcy prolongs a debtor's financial distress and exposes them to all of the negative effects summarized by the CPB

---

[5] Final Report of the ABI Commission on Consumer Bankruptcy (American Bankruptcy Institute, 2019), https://www.nclc.org/images/pdf/bankruptcy/rpt-abi-commission-on-consumer-bankruptcy.pdf.

investigators.  Moreover, it puts a debtor in the counter-intuitive position of having to muster the cash to pay an attorney while all of the debtor's creditors continue to clamor for payment.

Expecting counsel to file a chapter 7 case with the mere hope of a voluntary, post-petition payment is completely untenable.  Presumably, an attorney in this situation would be ethically obligated to explain to the debtor that the unpaid fees would be discharged in bankruptcy, leaving the attorney without a realistic hope of payment. Ultimately, this option makes the practice of chapter 7 debtor law inherently unattractive, all to the ultimate detriment of debtors and a system that works best when debtors have capable representation.

And, finally, placing debtors in chapter 13 solely to provide a means for attorneys to be paid is an ethically dubious practice, and clearly not in the best interest of debtors. "More than 95% of people who file under chapter 7 receive a discharge.  In contrast, a mere 33% of chapter 13 cases end in a completed repayment plan such that debtors receive a discharge.  Most chapter 13 bankruptcies end without debt forgiveness."  Pamela Foohey, Robert M. Lawless, Katherine Porter & Deborah Thorne, "'No Money Down' Bankruptcy", 90 So. Calif. L. Rev. 1055, 1057 (2017) (footnotes omitted). Moreover, "[a]ttorneys charge an average of $1,229 to file and represent a debtor in a chapter 7 case and an average of $3,217 to file and represent a debtor in a chapter 13 case," id. at 1058 (footnotes omitted), meaning that this practice costs debtors significantly more than simply filing a chapter 7.  In this district, the local rules allow a "no-look" Chapter 13 legal fee of $4,000.00. Paying more for a lower chance of success, and all just to provide a way for attorneys to get paid, is simply a bad idea.

Bifurcation of chapter 7 engagements is an increasingly common and accepted practice across the country.  The April 2019 *Hazlett* decision from Judge Anderson of the District of Utah that the UST references is one of the more comprehensive, thoughtful and recent analyses of the

practice.  See In re Hazlett, No. 16-30360 (Bankr. D. Utah April 10, 2019). Clifford White, the Director of the US Trustee Program, discussed that decision at some length in an August 2019 speech at the annual conference of the National Association Bankruptcy Trustees, describing the opinion as "well-reasoned," which led him to "commend" it to the USTP and the bar. Clifford J. White, Director, United States Trustee Program, Keynote Address at the Annual Meeting of the National Ass'n of Bankr. Trustees (Denver, Co., August 23, 2019) (published at https://www.justice.gov/ust/speech/remarks-director-cliff-white-2019-annual-conferencenational-association-bankruptcy). Mr. White went on to note that "the court's opinion provides an important four-part analysis in assessing bifurcation practices," and that "[i]t is instructive to the USTP and should be instructive to the bar as well." Id.

Notwithstanding the buzz generated by the *Hazlett* decision, though, the case law history of attorneys experimenting with different ways of offering post-petition payment terms to debtors goes back about 25 years.  See Garrison, Daniel E., "Liberating Debtors from the 'Sweatbox' and Getting Attorneys Paid: Bifurcating Consumer Chapter 7 Engagements," *ABI Journal* Vol. XXXVII, No. 6 (June 2018). In 2003, the Seventh Circuit held that the fees from a single, prepetition engagement agreement are discharged if not paid before the filing, see Bethea v. Robert J. Adams & Associates, 352 F.3d 1125, 1129 (7th. Cir. 2003), but rejected the idea that their holding necessarily meant that a debtor would have to forego representation if the entire fee could not be prepaid, observing that "[t]hose who cannot prepay in full can tender a smaller retainer for prepetition work and later hire and pay counsel once the proceeding begins—for a lawyer's aid is helpful in prosecuting the case as well as in filing it."  Id. at 1128.

The first two cases cementing the current practice of bifurcating chapter 7 engagements were decided in 2012. See In re Slabbinck, 482 B.R. 576 (Bankr. E.D. Mich. 2012); Walton v.

Clark & Washington, P.C., 469 B.R. 383 (Bankr. M.D. Fla. 2012). Since the *Hazlett* decision, the bankruptcy court in the Eastern District of Kentucky also has issued a published decision approving the practice of bifurcation, following closely the *Hazlett* rationale. See In re Carr, No. 19-20873 at 2 (Bankr. E.D. Ky. January 22, 2020).[6] Finally, just this week, the bankruptcy court for the Southern District of Florida issued its decision in In re Brown, *et al*., 2021 WL 2460973 (June 16, 2021), wherein the court determined that, subject to specific direction on disclosure to clients and the court (among other things), "so long as attorneys offering a bifurcated fee arrangement comply with the terms of this Order, those arrangements do not violate the Bankruptcy Code or Bankruptcy Rules, this Court's Local Rules, or the Florida Bar Rules." Id. at *20. Importantly, the Brown decision discusses local unbundling rules and reasonableness of fees, as discussed in more detail below.

This background lends itself to understanding why "skeletal" or "short" filings are common with the $0-down version of bifurcated chapter 7 engagements.[7] The Federal Rules of Bankruptcy

---

[6] In the time since the Walton and Slabbinck decisions, there have not been any fundamental changes in the best-practice approach for providing post-petition payment terms to chapter 7 debtors, but a number of attorneys have been taken to task for failing to meet the technical and ethical requirements that have been enunciated to bifurcate effectively. See, e.g., In re Grimmett, 2017 Bankr. LEXIS 1492 (Bankr. D. Id. 2017) (used single, pre-petition agreement; failed to properly disclose; used threats of withdrawal to force payment); In re Ashby, No. 13-34537 (Bankr. W. D. Ken. July 10, 2015) (failed to structure "straddle" agreement properly; inadequately disclosed to client; inadequately disclosed to court under Rule 2016; charged an unreasonable fee; accepted attorney fee payments before filing fee fully paid); In re Davis, 2014 WL 3497587 (Bankr. N.D. Ala. July 11, 2014) (used single pre-petition engagement agreement and took post-dated checks); In re Wright, 598 B.R. 68 (Bankr. N.D. Okla. 2018) (charged unreasonable fee and failed to properly disclose to the court). In each of these cases, the courts have either not been asked to opine on the fundamental question of bifurcation, or have chosen not to do so in view of the other legal and ethical issues upon which the decisions were predicated. This is, in fact the situation with the Milner case cited by the UST (which is currently on appeal).

[7] Strictly speaking, bifurcation can be used to split the engagement in any way that the attorney and client find mutually acceptable and that is objectively reasonable. So, for example, if a

Procedure allow the schedules and statements to be filed up to fourteen days after the petition date, and do not impose any conditions or requirements on that practice.  See Fed. R. Bankr. P. 1007(c).  It is this dynamic, however, that seems to predicate incorrect arguments that bifurcation constitutes impermissible "unbundling."

B.  The Pre- and Post-filing Agreements Do Not "Unbundle" the Services Provided to Debtor, and Do Not Violate Local Rule 2093(C)(3)

In a $0-down case, the client typically cannot pay anything up front, and the attorney waives their fee for the minimal work required to commence the bankruptcy case.  That initial work typically includes consulting with the client, conducting thorough diligence of the clients' situation, advising as to options and, if a chapter 7 bankruptcy is appropriate for the client, preparing the documents required under Fed. R. Bankr. P. 1007 to commence the case.

The attorney defers preparing the schedules as a way to balance the client's need for relief without paying up-front fees with the attorney's need to make the engagement economically feasible.  This type of balance is allowed under the Rules of Professional Conduct. See MO. R. Prof. Cond. 4-1.2 (a) and (c) and comm. [1] and [2].

And despite the need to structure a bifurcated engagement with separate pre- and post-petition agreements, and the consequent need to inform debtors that they are not obligated to execute a post-petition engagement agreement, the purpose of doing these things actually is to facilitate a plenary representation.  So, while the bifurcated structure is legally binding and "real," the purpose and the actual effect is to promote debtors having the benefit of having representation throughout the entire case.   This somewhat counterintuitive proposition (that you would

---

debtor can afford to pay something meaningful upfront, an attorney can file schedules and statements with the petition.

technically limit or structure the representation in an effort to facilitate a plenary representation) has been acknowledged by the courts.

In <u>Hazlett</u>, Judge Anderson distinguished bifurcation from "unbundling" or using a limited services agreement. <u>Hazlett</u> at 14. Observing that the "primary concern with unbundling is that the attorney provides a limited service and then leaves the client to his or her own devices to complete the legal process," the court noted in contrast that "the purpose of the bifurcated agreement is decidedly not to abandon the debtor, but to enable the attorney to be paid for the post-petition services." <u>Id.</u> (internal citations omitted). So, while under a bifurcated arrangement "debtors are given the option to proceed *pro se*," the "decision is solely up to the debtor, as the attorney is ready and willing to complete the representation upon the signing of the post-petition fee agreement." <u>Id.</u>[8] "Thus," the court concluded, "the bifurcated fee agreement is not for unbundling" and "only increases the affordability of the attorney's services and thereby increases a debtor's access to legal representation." <u>Id.</u> at 14-15; <u>see also</u> <u>Bethea</u>, 352 F.3d at 1128.

Ignoring these persuasive authorities, the UST instead relies here on <u>In re Prophet</u>, a South Carolina Bankruptcy Court decision, to argue that bifurcation is *per se* a violation of Local Rule 2093(C)(3).[9] He argues that the following aspects of the Rule were violated: (a) the Rule requires

---

[8] The option to forego signing a post-petition agreement and instead proceed *pro se* or to hire another attorney parallels the option that a client inherently has in every engagement. Regardless of whether an engagement is bifurcated into separate agreements, and regardless of limited-scope representation rules, clients inherently have the right to limit an engagement by terminating their attorney. Recognizing that the client always has this prerogative makes any suggestion that a bifurcated engagement entered into solely to facilitate a thorough, financially feasible representation violates limited-scope representation rules seems like a stark example of "form over substance."

[9] The <u>Prophet</u> decision, case no. 20-03131 (Bankr. D. S.C. Mar. 29, 2021), is on appeal. <u>See</u> <u>Matthews v. United States Trustee</u>, case no. 3:21-cv-01080-JMC (D. S.C.). In <u>Prophet</u>, the bankruptcy court distinguished the aforementioned decisions based upon its perception of the unique language in its local rule. Ridings maintains that the <u>Prophet</u> decision is less persuasive than the other cited authorities.

that an attorney for a debtor provide "all legal services necessary for representation"; (b) the Rule prohibits unbundling of legal services, but also "any similar arrangement"; and, finally (c) the Rule forbids a debtor's attorney from including in an attorney fee disclosure statement or a client agreement "any language" that either contradicts "or is inconsistent with" the Local Rule.[10]  The UST argues that by providing separate sets of services in the pre- and post-agreements, Mr. Ridings violated aspects (a) and (b) above of the Local Rule.  The UST is not clear as to how Mr. Ridings violated (c) above.  Nevertheless, the UST is incorrect as to all three assertions.

As this Court is aware, Local Rule 2093(C)(3) requires attorneys who file chapter 7 bankruptcies to provide an entire list of services, and, in turn, prevents those attorneys from withdrawing from the matter without first obtaining court approval.  In general, the rule is intended to protect debtors from the pitfalls of a "piecemeal" approach to chapter 7 bankruptcy.

Bifurcated agreements do not present those risks. From the beginning of the relationship, the attorney and client know that the attorney is going to handle the entire case, they just choose to split it between the two agreements so that the client can have the benefit of an immediate filing, and post-petition payment terms. This key distinction was highlighted in Hazlett:

> The Court wishes to distinguish between the use of bifurcated fee agreements and a limited services agreement or unbundling. With unbundling, the attorney is contractually limiting services to a discrete task, such as filing the bankruptcy petition. With bifurcated fee agreements, the attorney is contracting to represent the debtor during the entire case, contingent on the debtor signing the post-petition agreement. The primary concern with unbundling is that the attorney provides a limited service and then leaves the client to his or her own devices to complete the legal process. This is problematic, even though it is becoming more widely recognized that having at least some legal representation in a consumer Chapter 7 case is better than none.

---

[10] UST states that Mr. Ridings violated the third aspect of the Local Rule, forbidding a debtor's attorney from including in an attorney fee disclosure statement or a client agreement "any language" that either contradicts "or is inconsistent with" the Local Rule.  However, the UST fails to mention how Mr. Ridings violated this aspect of the Rule.

Hazlett at 14. As in the Hazlett decision, Mr. Ridings has made it clear to his client from the start of their communications that he and his firm would be handling their entire case from beginning to end. While Local Rule 2093(C)(3) is not explicitly cited in Riding's engagement agreement, the pre-filing services agreement does specifically note that if the debtors choose not to sign a post-filing services agreement, Mr. Ridings will continue to represent these debtors until and unless the court allows him to withdraw. The debtors also acknowledge that they are not signing the pre-filing services agreement in order to have Mr. Ridings simply represent them in filing the case, but instead to facilitate a plenary representation on terms that they can afford.

The Slabbinck decision from the bankruptcy court in the Eastern District of Michigan similarly concluded that limited-scope representation rules and bifurcation serve the same purposes. See In re Slabbinck, 482 B.R. 576 (Bankr. E.D. Mich. 2012). The Slabbinck court considered a UST argument that the bifurcated engagement constituted impermissible "unbundling" of services in violation of the Michigan rules of professional conduct, concluding (after an exhaustive review of case law and the Michigan ethical rules) that a debtor could agree to split the engagement between two agreements with adequate disclosure. Id. at 583-89. Summarizing its conclusion, the Slabbinck court noted:

> a pre-petition agreement to pay an attorney gives rise to a dischargeable debt. A post-petition agreement does not. For the Court to insist on an all or nothing approach, in the name of promoting attorneys' competence, will have the perverse effect of depriving needy individual debtors who cannot afford to pay in advance for all of the legal services they may need in an a Chapter 7 case, from hiring an attorney to provide them with any of the legal services that they may need in a Chapter 7 case.

Id. at 597. For the Slabbinck and Hazlett courts, finding that bifurcation violated "unbundling" rules would be akin to "throwing out the baby with the bath water."

The Brown court also concluded that bifurcation, when done correctly, does not run afoul of limited-scope-representation rules. See Brown, 2021 WL 2460973 at *10 to *13. The Brown

14

court observed that "regardless of whether the debtor signs a postpetition agreement, the firm is attorney of record for the debtor until the firm is allowed to withdraw, meaning that the firm is responsible for representing the debtor if withdrawal has not been approved by that date." Id. at *11. The Brown court reached this conclusion in full harmony with its own local "unbundling" rule. See id. at *11 (citing Bankr. S.D. Fla. L.R. 2090-1(E)).

C. Counsel's Bifurcated Engagement Agreements Satisfy Local Rule 2093(C)(3)

Counsel's bifurcated engagement agreements do not violate Local Rule 2093(C)(3) and, in fact, the purpose of bifurcation is completely consistent with the policy basis for the Local Rule. Concluding that bifurcation violates the Local Rule would undermine the rationale for restricting limited-scope representations.

This Court should find that Counsel's bifurcated engagement agreements comply explicitly with Local Rule 2093(C)(3), which provides:

> Regardless of which chapter of the Bankruptcy Code the case is under, debtor's counsel shall provide all legal services necessary for representation of the debtor in connection with the bankruptcy case until conclusion of the case, except for, at the discretion of debtor's counsel, representation of the debtor in an adversary proceeding and/or an appeal, for the fee set forth in the attorney fee disclosure statement filed with the Court pursuant to L.R. 2016-1(A). "Unbundling" of legal services or any similar arrangement is prohibited, and debtor's counsel shall not include any language in the attorney fee disclosure statement or in a client agreement that contradicts or is inconsistent with this Rule. Debtor's counsel may, subject to any applicable Bankruptcy Code sections and rules governing compensation of professionals, be additionally compensated for representation of the debtor in an adversary proceeding and/or an appeal. This is regardless of the fee option selected in a Chapter 13 case.

Counsel's form of agreement fully complies with the Local Rule, because it explicitly contemplates a plenary representation, and that Counsel only may withdraw with leave of this Court. Also, Counsel has, in fact, represented this debtor throughout his case and has never sought to withdraw.

15

Counsel uses the recommended form of pre-filing and post-filing engagement agreements provided by FSF, which explicitly provide that "the Law Firm has expressed that it is ready, willing and able to represent you for your entire chapter 7 case," and that the client is not bifurcating the engagement "with the intention of having the Law Firm simply file your case and then withdraw, but instead to facilitate you making payments over time for your attorney fee so that you can have an attorney represent you through the entire chapter 7 process."  Pre-Filing Agreement,¶ 6.A; Post-Filing Agreement, ¶ 6.A  This distinction is critical to distinguishing bifurcation from "unbundling," as discussed at length, above. Moreover, the Pre-Filing Agreement further provides that if the client chooses not to enter into a Post-Filing Agreement, Counsel "will ask the bankruptcy court to allow us to withdraw as your lawyer in accordance with the bankruptcy rules, but we will continue to represent you in the case and perform all necessary services until and unless the bankruptcy court allows us to withdraw." Pre-Filing Agreement, "Option #2—File Now Pay Later" at 3.

Because bifurcation serves the same policy purposes behind rules that seek to restrict or prohibit limited scope representation, under well-accepted canons of statutory construction this Court should reconcile them compatibly.  For example, in <u>Reves v. Ernst & Young</u>, 494 U.S. 56 (1990), the United States Supreme Court had to define the phrase "any note"  in the definition of "security" to determine whether a creatively structured financial instrument that was denominated a "note" was in fact a regulated security under the Securities and Exchange Act. <u>Id.</u> at 60-61. The Court approached the question from the perspective of Congressional purpose and intent.  The Court first observed that Congress had a very broad purpose in the Act, <u>Id.</u> at 61, but then postulated that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in

enacting the Securities Act." Id. at 63.  Although the Court ultimately concluded that the note under review was a security, it first parsed the language and its purpose to observe that not all notes are securities, even though the definition in the Act listed "all notes." See Id. at 60-67.  Reves is a case of "latent ambiguity" where apparently simple language could have been interpreted overbroadly, but for the Court's consideration of the public policy behind the language, and a determination of whether a particular conclusion was sensible in view of the rule's intent.

The lesson from Reves is instructive here.  While a straightforward reading of the Local Rule does not appear to prohibit bifurcation, any doubt about that must be resolved with reference to the purpose behind limited-scope representation or so-called "unbundling" rules.

The Hazlett court considered and rejected an argument that a bifurcated agreement was contrary to a very similar local rule that flatly prohibited limited-scope representations and further provided that "[t]he scope of representation cannot be modified by agreement." Hazlett at 19 (quoting L.R. Bankr. P. 2091-1 (Bankr. D. Utah)). The Hazlett court noted that:

> The intent of this rule is indeed to restrict the use of limited-service agreements (unbundling) by debtor's counsel. However, as noted above, the difference with Capstone's bifurcated agreement procedure is that the law firm is willing to complete the representation, and it is only by the debtor's election that the case proceeds pro se. Debtors are free at any time to terminate a lawyer's services, so the Court does not see the use of bifurcated fee agreements as creating the problem addressed by Local Rule 2091-1.

Id. This Court should reach the same conclusion.

In short, the apparent purpose behind the Local Rule is to make sure that debtors have representation for their entire chapter 7 case.  The entirely consistent purpose of bifurcation is to provide a way for debtors to afford representation for their entire case.  Attorneys and clients do not enter into bifurcated chapter 7 engagements to limit the services that the attorney will provide; rather, they enter into them in order to provide a way for the debtor to have the benefit of a plenary

representation.  Hence, this Court should resolve any perceived or potential inconsistency between

bifurcation and its Local Rule in favor of approving bifurcation.

      D.    <u>Counsel's Fees in This Case Are Reasonable under Section 329 and Fed. R.
Bankr. P. 2017</u>.

The UST's challenge to the reasonability of Counsel's fees fails as a matter of law because

the controlling lodestar standard is not even discussed, let alone applied to the facts of this case.

Bankruptcy Rule 2017, which implements Section 329 of the Code, expressly authorizes the court

to analyze and determine whether any payment made to a debtor's attorney is reasonable or

excessive, whether such agreement is made before the order for relief (Rule 2017(a)), or after the

order for relief (Rule 2017(b)), so long as such services are "in any way related to the case." <u>See</u>

Fed. R. Bankr. P. 2017.  Reasonableness for purposes of Section 329 is determined with reference

to the standard imposed by Section 330.  See, e.g., <u>Am. Law Ctr., PC v. Stanley (In re Jastrem)</u>,

253 F.3d 442, 443 (9th Cir. 2001) (invoking § 330(a)(3) in review of § 329(b) order).  Under Section

330, the bankruptcy court must "consider the nature, the extent and the value of such services,

taking into account all relevant factors." 11 U.S.C. § 330(a)(3).  "Within the boundaries of Section

330, courts usually use the lodestar standard as a means for determining the reasonableness of

compensation, which is calculated by multiplying a reasonable number of hours spent on a case

by a reasonable hourly rate." <u>See</u> <u>In re Lexington Hearth Lamp & Leisure, LLC</u>, 402 B.R. 135 at

140-141 (Bankr. M.D. N.C. 2009) (<u>citing</u> <u>In re Kieffer</u>, 306 B.R. 197, 205 (Bankr.N.D.Ohio

2004)).

The Supreme Court has strongly embraced the lodestar standard for determining a

reasonable attorney fee because it "is readily administrable;" it "cabins the discretion of trial

judges, permits meaningful judicial review, and produces reasonably predictable results."  <u>See</u>

<u>Perdue v. Kenny A.</u>, 559 U.S. 542, 130 S.Ct. 1662, 1672 (2010).  In order to conduct a lodestar

analysis, a trial judge must determine "the prevailing market rates in the relevant community," because the test was "[d]eveloped after the practice of hourly billing had become widespread." Id. The lodestar method thus produces an award that an "attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." Id.

Nevertheless, in a very recent decision by the Eight Circuit Bankruptcy Appellate Panel involving these same parties, the BAP noted that "[c]ourts are not bound to apply the lodestar calculation in every case where an attorney's fees are challenged." Ridings v. Cassamata (In re Allen, et al.), No. 20-6023 (8th Cir. B.A.P. June 21, 2021) ("Allen"). Citing to a decision in a chapter 13 case, the Allen panel noted that "we found that in chapter 13 cases, wherein most of the attorney fees are 'normal and customary,' the lodestar analysis may not be the best method to use when determining reasonableness." Id. at *7 (citing In re Kula, 213 B.R. 729, 737 (8th Cir. B.A.P. 1997). The Allen panel ultimately concluded that even if it employed a lodestar analysis, Ridings failed to adduce evidence that would compel it overturn the bankruptcy court's decision to disallow $500 of Ridings' fee, and affirmed the underlying decision. Id. at *8. The Allen panel rejected Ridings' reliance on a what it viewed as a "hypothetical" breakdown of typical services in a chapter 7 case and noted that "it bore little resemblance to Mr. Ridings' customary practice in handling chapter 7 cases and included work that typically does not arise in a straightforward chapter 7 filing. The exhibit lacked any relevance as to what services were actually performed by Mr. Ridings in these cases as opposed to some hypothetical case. Simply put, Mr. Ridings presented no evidence that would enable the court to conduct a lodestar analysis." Id. at *8 (emphasis in original).[11]

---

[11] Ridings expects, of course, to be required to submit more extensive proof here as a result of the Allen decision.

Regardless, in his Motion the UST does not apply either the lodestar standard or any comparison to perceived market rates for chapter 7 or 13. Instead, the UST focuses solely on the $200 difference between the pay-over-time fee actually charged in this case, and the prepaid option offered to but not chosen by the debtor.  The appropriate focus is on the reasonableness of the fee actually charged, not on what was offered to the debtor but not chosen, and not practically available to that debtor due to their circumstances. See Cf., In re Hazlett, No. 16-30360 at 2, 21 (Bankr. D. Utah April 10, 2019) (attorney's $2000 post-petition fee in a bifurcated case deemed reasonable despite being nearly double the $1,200 prepaid fee that a competitor offered to the same debtor). Here, the post-petition fee to bifurcate the case was $1,325 versus the $1,125 prepaid fee – a difference of only $200. Not only is a fee of $1,325 objectively reasonable here; the difference of $200 to obtain a pay-over-time solution (which requires more work, cost and risk) also is objectively reasonable.

Moreover, the UST's argument suggests that Counsel may not charge different clients different fees, which has no basis in the Code or the ethics rules.  The UST essentially suggests that Counsel must establish a single, flat fee for chapter 7 work, which must be offered to every client, and which cannot change over time or under different circumstances. That is illogical, and ignores local practice.  Within the upper limit of "reasonableness," an attorney may charge a given client whatever the attorney and client agree. As this Court is well aware, in chapter 13 cases debtor's counsel may charge any fee that they choose so long as it below the approved "no-look" fee, which establishes presumptive reasonableness. The Court does not inquire into why different

20

chapter 13 cases might justify different fees, so long as the fee actually charged is below the presumptive threshold.[12]

Even if this Court were to consider the market range of chapter 7 flat fees to assist in determining a reasonable, market hourly rate, comparing pay-over-time flat fees to prepaid flat fees is an "apples to oranges" comparison. Because both attorneys and debtors are under constraints in the traditional engagement structure, prepaid fees cannot be considered an indication of the fair market value of a chapter 7 debtor attorney's time. Debtors often are under unimaginable financial pressure before obtaining relief in a bankruptcy and are highly price-sensitive when faced with the nearly insurmountable task of accumulating hundreds or even thousands of dollars before they can obtain relief. Likewise, attorneys who employ a single, prepetition engagement agreement must collect their entire fee in advance or risk the unpaid balance being discharged—and are trying to collect these fees from people under severe financial distress. Consequently, prepaid chapter 7 services are highly commoditized, and attorneys are left to compete solely on price.[13] One need only consider the effective hourly rate that Counsel has

---

[12] Moreover, much of the same work is involved in a chapter 13 case as in a chapter 7 case. On any given day, Counsel meets with prospective debtors who might file under either chapter, and must advise which chapter best serves the clients needs. All of the prefiling activity other than the drafting of a proposed plan (which follows templates and accepted practice) is the same in chapter 13 as chapter 7. Schedules and statements and 341 meetings are the same. The same range of motions are possible across both chapters, and much of the client support and trustee communication are the same, as well. It seems ill-advised to create an economic incentive for counsel to prefer chapter 13 over chapter 7, but the plague of "fee-only" chapter 13 cases is an ethical and economic blight in some parts of the country. See supra at 8.

[13] In the groundbreaking 2011 Final Report that Professor Lois Lupica did on her study of consumer bankruptcy fees, she noted the financial challenges of practicing in consumer chapter 7:

> Respondents repeatedly observed a disconnect between the time it takes to responsibly represent a consumer debtor in a Chapter 7 case, and the legal fee the market will support. One attorney noted "Doing a thorough job is time-consuming, and unfortunately most debtors can't afford to pay a fee sufficient to compensate

charged in the past to understand that Counsel rarely receives his normal hourly rate for chapter 7 work under a traditional, prepaid structure. In fact, Counsel's normal hourly rate is $350/hour—which at his prepaid flat fee of $1,125 represents less than 4 hours of total work (a dearth of attention that would undoubtedly give this Court pause). Once an alternative is presented for debtors to make payments over time after their bankruptcy is filed, attorneys and debtors are liberated from the constraints that commoditize attorneys and artificially drive down their fees. Debtors likewise are provided with a much more feasible way to pay for and have the benefit of thorough representation.

And, in fact, there are good reasons for there to be a difference in the fee when Counsel bifurcates the engagement and allows a debtor to pay over time. As the UST notes in the Motion, Counsel's fee disclosures to the Court explain the different work, risks and costs associated with both bifurcating the engagement, and using a third-party financing company to accommodate the client's inability to prepay a fee. See, e.g. UST Motion, ¶¶ 9-13. Similar explanations exist in the client agreements, as well. See, e.g., Post-Filing Agreement. ¶ 16.

In applying a reasonableness analysis to a chapter 7 flat fee, consideration also must be given to the value of the services that the attorney is committing to provide, whether such services end up being needed in a particular case. See, e.g., Brown at *8-10." Because a flat fee encompasses all required services and the extent of required services is not fully predictable at the

---

for that time." Others remarked that market fees are "depressed by attorneys . . . operating at a loss." Still another remarked, "My fee does not cover my time for most of my Chapter 7 practice. I probably represent Chapter 7 debtors because I've always done so, and as a favor to referring attorneys who refer other bankruptcy matters to me."

"The Consumer Bankruptcy Fee Study: Final Report," Lupica, Lois R. at 90 (Amer. Bankr. Inst., December 2011) found at https://abi-org.s3.amazonaws.com/Endowment/Research_Grants/CFSFinalReport_Final_Dec7.pdf (internal footnotes omitted) (hereinafter, "Lupica Report").

outset of a case, the reasonableness of a flat fee cannot necessarily be determined based on the amount of services required in the case." Id. at *10 (quoting In re Dabney, 417 BR. 826, 831 (Bankr. N.D. Fla. 2009). Accordingly, the Brown court concluded that it would "review the reasonableness of the postpetition flat fee charged by each of the Law Firms by taking into account not only the work that was done, but also the services that might have been required in the case for which there would have been no additional charge." Id. Likewise here: local district rules generally require an attorney who files a chapter 7 case to stand ready to provide all needed services in the case, whether they were specifically predicted or accounted for in setting a flat fee. It is only fair, therefore, to consider the value of the risk to the attorney that any or all of those services may be required in any given case.

Moreover, it is ethically permissible to pass on a financing charge when a client is aware of it and gives their informed consent, so long as the overall fee is reasonable.

> Some clients may be unable to afford lawyers' fees absent some form of accommodation or assistance. For example, a criminal defense or family law client may be unable to afford a lawyer's flat fee at the outset of a representation. The client may be able to afford the lawyer's fee, however, if the client can finance the fee through a loan from a third-party. Or, a client may simply wish to finance a lawyer's fee rather than pay a lump sum.

See Formal Opinion 484, ABA Standing Committee on Ethics and Professional Responsibility, at 1. The attorney's cost of financing can be passed on to a client with adequate disclosure and so long as the overall fee remains reasonable. Id. at 10-11.

Which returns us to the "bottom line" from a legal perspective: if the total, flat fee charged this debtor is reasonable compared to the hourly value of Counsel's time, and/or to the "no-look" chapter 13 fee allowed in this district for much of the very same work, it satisfies Section 329, regardless of what costs and considerations led Counsel to set the fee at that level. This clearly is a factual matter that will have to be developed, but Counsel is confident that the lodestar value of

the services she committed to provide this debtor satisfies Section 329, and will adduce evidence of this at an evidentiary hearing on the UST's motion.

 **CONCLUSION**

Counsel's fee is not unreasonable, and the UST's argument concerning that issue is predicated on a completely erroneous interpretation of the controlling standards. The bifurcated engagement structure that Counsel entered into with the Debtor is consistent with well-accepted practice and Local Rules, and Ridings adequately informed Debtor of his options. The UST Motion is not well-taken and should be denied.

RESPECTFULLY SUBMITTED this 22nd day of June, 2021,

 */s/ William H. Ridings, Jr.*
William H. Ridings, Jr.
Ridings Law Firm
2510 South Brentwood Boulevard, Suite 205
St. Louis, Missouri 63144
Telephone: (314) 968-1313
Ridingslaw2010@yahoo.com

/s/ *Daniel E. Garrison*
Daniel E. Garrison, AZ Bar 021495
Admission *pro hac vice* pending
Protego Law, PLLC
1805 N. Scottsdale Rd., Ste. 100
Tempe, AZ 85281
Tel: (480) 504-6840
dan@protegolaw.com

## CERTIFICATE OF MAILING

This is to certify, under penalty of perjury, that on June 22, 2021, the foregoing was electronically filed, and also emailed to those parties in interest set forth below.

Joe Schlotzhauer, Trial Attorney
Office of the United States Trustee
joseph.schlotzhauer@usdoj.gov